DECISION AND JOURNAL ENTRY
{¶ 1} Appellant, Arnold D., Sr., has appealed from a judgment of the Summit County Court of Common Pleas, Juvenile Division, that terminated his parental rights and granted permanent custody of five minor children, A.D., A.D.Jr., K.D., R.D., and J.D., to the Summit County Children Services Board ("CSB"). This Court affirms.
 I. {¶ 2} Kella D., ("Mother") is the biological mother of A.D., born September 13, 1989; A.D.Jr., born October 8, 1991; K.D., born June 27, 1995; R.D., born June 9, 2000; and J.D., born August 11, 2001. She did not participate in the permanent custody hearing below and is not a party to the present appeal. Appellant was married to Mother at the time of conception and birth of all five children, and he is, therefore, presumed to be their father. See R.C. 3113.01(A)(1). The parties agree that Antonio Lopez is the biological father of R.D, but paternity testing was not done. Lopez did not participate in the proceedings below and is not a party to this appeal. Service was obtained on Mother, Appellant, Lopez, and John Doe, as the unknown father of all five children.
 {¶ 3} The present case began when 13-year-old A.D. informed school personnel of inappropriate touching by Appellant, and the school referred the matter to CSB. On May 2, 2003, CSB filed a complaint alleging that all five children were dependent, neglected, and abused. In addition to the allegations of sexual abuse, there were concerns of inappropriate parenting, domestic violence, mental health problems, and drug abuse. The trial court placed the children in emergency temporary custody.
 {¶ 4} The matter proceeded to adjudication where, on July 30, 2003, the parties stipulated to facts and to findings of abuse and dependency with regard to each of the subject children. The allegations of neglect were dismissed. The stipulations included the following. A.D. is the victim of sexual activity, and she suffers from physical or mental injury because of the acts of her father. She is endangered by her mother's failure to protect her from severe physical and sexual abuse inflicted by her father. All of the other children are abused, in danger of being abused, and endangered by their mother's failure to protect them from physical and mental harm inflicted by their father. In addition, all of the children were dependent because their mother is unable or unwilling to appreciate the serious risk of harm her children are exposed to when she fails to adequately protect them, and their father is unable or unwilling to understand that sexual abuse upon a child inflicts serious and lasting consequences upon the child.
 {¶ 5} The factual basis for the adjudications was also stipulated by the parties and included the following. The parents had a lengthy history with children services agencies in Summit County, Arizona, and Texas, covering at least six years. A case plan was opened in 1998 in Arizona based on allegations that Appellant sexually abused A.D.A.D. was removed from the home, but Mother seldom visited her and largely ignored her. A.D. eventually recanted her charges, "seemingly due to the way her mother was treating her." Texas authorities investigated additional charges of sexual and physical abuse in 2002. The present case was opened in Summit County in 2003. The parents were said to have a pattern of moving after the father got in trouble for abusing the children.
 {¶ 6} Further stipulations include the fact that on or about May 1, 2003, A.D. told a school counselor that, in August 2002, her father held her down on her bed and fondled her breasts. A.D. explained that she delayed in reporting the incident because no one in her family believed her previous reports of abuse by her father and she was ridiculed by them. She finally disclosed the information because it continued to upset her. A.D. also reported that her father physically abused her and two siblings, A.D.Jr. and K.D. He once picked K.D. up by her hair and shook her. Her father also called the children and mother names, including "bitch," "mother fu____," "dumb ass," and "stupid ass." The parents fought almost daily. When CSB, requested that Appellant leave the premises so that the children could remain there with their mother, Appellant reluctantly agreed, but then angrily told the CSB representative to "take all these mother fu____."
 {¶ 7} Subsequently, at the dispositional hearing, Appellant agreed to place the children in temporary custody. A case plan was adopted by the trial court, and a no-contact order was put in place for Appellant and A.D. Ultimately, CSB filed a motion for permanent custody on September 29, 2004. Appellant and Janice Archie, a paternal aunt, each moved for legal custody of the children. Following a four-day hearing and in camera interviews of the three oldest children, the trial court denied the motions for legal custody and granted CSB's motion for permanent custody.
 {¶ 8} Appellant has timely appealed and assigned three errors for review.
 II. ASSIGNMENT OF ERROR I
"THE GRANTING OF PERMANENT CUSTODY WAS A DIRECT VIOLATION OF APPELLANT'S FIFTH AMENDMENT RIGHT AGAINST SELF-INCRIMINATION."
 {¶ 9} Appellant argues that his Fifth Amendment right against self-incrimination was violated by the inclusion of the case plan requirement that he participate in a sexual offender group treatment program without an offer of immunity, when such treatment required him to admit that he sexually abused his daughter.
 {¶ 10} Upon review, we are persuaded that Appellant's argument is without merit for three reasons. First, there was significant credible evidence of Appellant's sexual abuse from other sources without reaching Appellant's failure to participate in sexual offender group treatment sessions. In other words, the judgment of the trial court in the present case is not based solely on the parent's failure to admit sexually abusing his child and a correlative failure to satisfy the requirements of his case plan, as in the case authority cited by Appellant. See In reAmanda W. (1997), 124 Ohio App.3d 136, 141 (parents were made fully aware of fact that failure to admit to sexual abuse would lead to loss of custody). See, e.g., In re Harmon (Sept. 25, 2000), 4th Dist. No. 00CA2693, at *37 (sexual abuse allegation was not the sole reason for terminating parental rights).
 {¶ 11} In the present case, the record included the testimony of two therapists, a psychologist, the guardian ad litem, and a CSB caseworker — all of whom considered the allegations of A.D. regarding sexual abuse by Appellant and found her claims to be consistent and credible. In addition, the clinician who conducted the sexual abuse evaluation of Appellant, testified that he did not believe Appellant's denials, and concluded that there was a high probability that Appellant committed the alleged offenses against A.D. and that he was at a high risk to re-offend. The trial judge also noted Appellant's admission that another daughter and a niece had made similar accusations against him. Finally, the trial judge interviewed A.D. in camera and was able to evaluate her credibility. The trial judge found the allegations that Appellant sexually abused A.D. to be credible.
 {¶ 12} Second, the record indicates that Appellant stipulated to the findings of abuse and dependency, as well as to the facts set forth above at the time of adjudication. While Appellant later claimed that he did not understand what he was agreeing to, he was present in court and with counsel at the time of the stipulation. The matter was originally presented to a magistrate and Appellant filed no objections to the decision of the magistrate, nor did he appeal from the order of the trial court.
 {¶ 13} Third, the trial judge in this case did not rely solely on the issue of sexual abuse in concluding that Appellant's parental rights should be terminated. She also found that Appellant acknowledged conduct that was physically and psychologically abusive. In addition, there was evidence that Appellant failed to participate in any mental health treatment, which was required by his case plan and which might have helped him gain insight into his own behavior.
 {¶ 14} Accordingly, because there is significant evidence supporting the claim of sexual abuse of A.D. by Appellant, including facts stipulated by Appellant, and because the judgment of the trial court is not based solely on Appellant's failure to attend substance abuse group treatment sessions, the first assignment of error is overruled.
 ASSIGNMENT OF ERROR II
"THE TRIAL COURT ERRED IN ITS DETERMINATION THAT THE SUMMIT COUNTY CHILDREN SERVICES BOARD PUT FORTH [REASONABLE] EFFORTS TO REHABILITATE THE FAMILY SITUATION[.]"
 {¶ 15} Appellant contends that CSB was improperly relieved of its obligation to make "reasonable and diligent efforts to formulate a case plan" that did not violate Appellant's Fifth Amendment rights because the children were in custody for more than 12 of 22 consecutive months. For its part, CSB contends the case plan component regarding sexual offender evaluation and treatment was neutral.
 {¶ 16} Appellant's argument is without merit. It appears that Appellant is relying upon the language of R.C. 2151.414(E)(1). However, R.C. 2151.414(E)(1) does not require the agency to use "reasonable case planning and diligent efforts" to reunify the family, but rather addresses those efforts within the context of a parent's failure to remedy the circumstances causing the child's removal from the home. In re Thompson
(Jan. 10, 2001), 9th Dist. No. 20201, at *17. Moreover, R.C. 2151.414(E) and R.C. 2151.414(E)(1), read together, indicate that if the agency conducts "reasonable case planning and diligent efforts" to assist the parents in resolving the conditions which caused the initial removal of the children and the parents fail to substantially remedy those conditions, then the court is required to find that the child cannot be placed with the parents within a reasonable time. See R.C. 2151.414(B)(1)(a).
 {¶ 17} A finding that a child cannot be placed with a parent within a reasonable time is only one of four alternative means of satisfying the first prong of the permanent custody test. See R.C. 2151.414(B)(1). In the present case, the trial court did not rely upon this factor in satisfaction of the first prong of the permanent custody test. Rather, it found that the first prong of the permanent custody test was satisfied by the fact that the children had been in the temporary custody of the agency for 12 or more months of a consecutive 22-month period. See R.C. 2151.414(B)(1)(d). Appellant has not posed a genuine challenge to the trial court's finding pursuant to R.C. 2151.414(B)(1)(d).
 {¶ 18} It should also be noted that R.C. 2151.419 imposes a requirement that the agency prove that it has made "reasonable efforts" to prevent the removal of a child, the continued removal of a child, or to make it possible for the child to return safely home when it removes a child from the child's home or continues the removal from the child's home. The record in this case indicates, however, that the trial court made a finding of reasonable efforts on the part of the agency at adjudication and Appellant failed to appeal from that final order. Further, Appellant stipulated to a finding of reasonable efforts at the September 27, 2004 review hearing. Accordingly, Appellant's assignment of error is overruled.
 ASSIGNMENT OF ERROR III
"THE JUDGMENT OF THE TRIAL COURT THAT THE BEST INTERESTS OF THE MINOR [CHILDREN] WOULD BE SERVED BY THE GRANTING OF PERMANENT CUSTODY WAS AGAINST THE MANIFEST WEIGHT AND SUFFICIENCY OF THE EVIDENCE."
 {¶ 19} Appellant contends that the judgment of the trial court that the best interests of the children would be served by an award of permanent custody was against the manifest weight of the evidence.
 {¶ 20} Before a juvenile court may terminate parental rights and award permanent custody of a child to a proper moving agency it must find clear and convincing evidence of both prongs of the permanent custody test: (1) that the child is abandoned, orphaned, has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period, or that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent, based on an analysis under R.C. 2151.414(E); and (2) that the grant of permanent custody to the agency is in the best interest of the child, based on an analysis under R.C. 2151.414(D). See R.C. 2151.414(B)(1) and 2151.414(B)(2); see, also, In re William S. (1996), 75 Ohio St.3d 95, 99.
 {¶ 21} The trial court found that the first prong of the permanent custody test was satisfied because the children had been in the temporary custody of CSB for at least 12 of the prior 22 months. Appellant does not contest that finding. He challenges only the finding as to the best interest prong of the permanent custody test.
 {¶ 22} When determining whether a grant of permanent custody is in the children's best interests, the juvenile court must consider the following factors:
"(1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
"(2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
"(3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999; [and]
"(4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency [.]" R.C. 2151.414(D)(1)-(4).[1]
 {¶ 23} Although the trial court is not precluded from considering other relevant factors, the statute explicitly requires the court to consider all of the enumerated factors. See In re Smith (Jan. 2, 2002), 9th Dist. No. 20711, at *7. See, also, In re Palladino, 11th Dist. No. 2002-G-2445, 2002-Ohio-5606, at ¶ 24.
 {¶ 24} The best interest prong of the permanent custody test requires the agency to prove by clear and convincing evidence that permanent custody is in the best interest of the child. Clear and convincing evidence is that which will "produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." Inre Adoption of Holcomb (1985), 18 Ohio St.3d 361, 368, quoting Cross v.Ledford (1954), 161 Ohio St. 469, paragraph three of the syllabus.
 {¶ 25} Appellant argues that the judgment of the trial court was against the manifest weight of the evidence. When evaluating whether a judgment is against the manifest weight of the evidence in a juvenile court, the standard of review is the same as that in the criminal context. In re Ozmun (Apr. 14, 1999), 9th Dist. No. 18983, at *3-4. In determining whether a criminal conviction is against the manifest weight of the evidence:
"The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." State v. Thompkins (1997), 78 Ohio St.3d 380, 387, quotingState v. Martin (1983), 20 Ohio App.3d 172, 175.
Moreover, "[e]very reasonable presumption must be made in favor of the judgment and the findings of facts [of the trial court]." Karches v.Cincinnati (1988), 38 Ohio St.3d 12, 19. Furthermore, "if the evidence is susceptible of more than one construction, we must give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the trial court's verdict and judgment." Id.
 {¶ 26} Accordingly, before an appellate court will reverse a judgment as being against the manifest weight of the evidence in this context, the court must determine whether the trier of fact, in resolving evidentiary conflicts and making credibility determinations, clearly lost its way and created a manifest miscarriage of justice.
 {¶ 27} We, therefore, proceed to consider the evidence regarding the best interest factors as stated in R.C. 2151.414(D).
1. The personal interactions and interrelationships of the children
 {¶ 28} The first best interest factor requires consideration of the personal interactions and interrelationships of the children with others. Looking first to the parents, the evidence indicates that they had a very volatile relationship, which often included physical and verbal abuse in front of the children. Mother was unable or unwilling to protect the children from Appellant's abuse. Because the parents were so consumed with their own problems, the children, especially A.D., were forced to do a great deal of the care-giving. The parents thus failed to address the needs of the children.
 {¶ 29} Next, as to Appellant individually, the record indicates he has denied sexually abusing A.D., but at the adjudication hearing he stipulated to sexually abusing A.D. Appellant also admitted spanking all of the children with his hand, a belt, a paddle and a board, and does not believe he acted inappropriately. He admitted cursing in front of the children, and referring to them as "bitch," "dumb ass," and "stupid ass." Appellant nevertheless maintains that he loves his children and is a good father.
 {¶ 30} Both A.D. and A.D.Jr. repeatedly expressed anger towards Appellant for the abuse he imposed on them, and consistently refused Appellant's efforts to visit with them during the two years of this proceeding. They wanted nothing to do with him. A.D. felt threatened by him and unsafe with him. A.D.Jr. states that he is no longer afraid of Appellant since he has begun to believe he will not be returned to him.
 {¶ 31} Appellant attended visitations with the three younger children on a regular basis. He brought snacks and something for the children to do during visitations. He got down on the floor, played with them and interacted well. Early in the proceeding, K.D. indicated that her father had hurt her and she stayed away from him. CSB caseworker Karen Annis testified that she observed no positive bond between them. Later in the proceedings, caseworker Alexis Jemison-Knott found that K.D.'s relationship with her father was positive and that they were bonded. Early in the proceeding, R.D. was said to enjoy attention from anyone — even a case aide. Again, later in the proceedings, caseworker Jemison-Knott said R.D. was very bonded to her father, and spent most visitations sitting in his lap. J.D., at two years old, seemed to have a normal relationship with his parents.
 {¶ 32} As to Mother, A.D. and A.D.Jr. initially hoped to be reunited with her, but when she started missing visitations, they were emotionally hurt and somewhat angry. Eventually, Mother stopped coming altogether. By the time of the permanent custody hearing, she had not had contact with any of the children for seven months. The two older children had given up any hope of reunification with her, and the younger ones no longer asked about her. There is no longer a bond between Mother and any of the children.
 {¶ 33} The five children are currently divided among three separate foster homes. The foster families arrange for them to visit each other. Except for a difficult relationship between A.D. and A.D.Jr, the children get along very well and enjoy their visits together. Both A.D. and A.D.Jr. would like to maintain their relationships with the younger children. A.D. is particularly kind and nurturing to them.
 {¶ 34} Lois Archie and Janice Archie are both sisters of Appellant. Each of them testified that they did not believe Appellant sexually abused any of his children. A.D.Jr. and K.D. asked to live with Lois Archie, suggesting a positive relationship, but she testified she was not able to assume custody. She had not visited with any of the children during this proceeding.
 {¶ 35} Janice Archie concedes that Appellant hit A.D.Jr. with his hand and a belt, used profanity in front of the children, and did not spend enough time with them, yet seems to find his discipline acceptable and believes he is a good father. Both A.D. and A.D.Jr. warned against placing any of the younger children with Janice Archie. CSB also expressed concern that Archie did not recognize the risk that Appellant presented to the children and that she permitted Appellant in the home while the children were there. Janice Archie had moved for legal custody, but has not appealed from the denial of her motion. She has not maintained contact with any of the children except J.D.
 {¶ 36} In regard to the interaction and interrelationship of the children with their parents, it is appropriate to consider the allegations of A.D., which initiated this proceeding. Testimony regarding A.D. and her allegations of sexual and physical abuse by her father was presented by Dr. Lori Solaro-Straub, a child psychologist from Children's Hospital, and two therapists from Child Guidance, Wendy Hogan and Kara Kaelber. Together, they testified that A.D. initially presented with anxiety, depression, behavioral problems, aggression, academic problems, complaints of nightmares, and suicidal thinking. She was on medication for depression and attention deficit hyperactivity disorder. Her past trauma was said to cause much of her difficulty in relating to people. A.D. has improved while she has been in counseling and foster care, but all three witnesses agree that she needs on-going counseling.
 {¶ 37} According to these three witnesses, A.D. was very consistent in her allegations that she had been physically and sexually abused by Appellant. A.D. reported physical abuse in that Appellant hit her with boards, belts, switches, and his hand, and that he also hit her siblings. In addition, A.D. reported sexual abuse. She claimed that Appellant started touching her vaginal area at the age of nine. A.D. reported one occasion when Appellant took her in a truck, tied her up with rope, and touched her vaginal area. A.D. admitted that she recanted allegations of sexual abuse she made at the age of nine, but denied that the recantation was the truth; she claimed she recanted only because she wanted the family to stay together. More recently, A.D. told her school guidance counselor that Appellant put his hands down her shirt and pants. That referral led to the present case.
 {¶ 38} Significantly, all three witnesses concluded that they believed A.D.'s allegations of abuse. Hogan saw several signs of sexual abuse in A.D., including sexualized talk and sexualized behavior. Kaelber admitted that A.D. was the type of child who might lie to gain attention, but the therapist did not believe A.D. was lying in this instance. Solaro-Straub noted A.D.'s consistency in her statements and indicated that she, too, believed A.D.'s claims of sexual abuse by her father.
 {¶ 39} In addition, Gina D'Aurelio, the guardian ad litem admitted that she was not certain, at first, that A.D.'s accusations of sexual abuse were true. But after working with A.D. and the child's therapists over the full course of these proceedings, she became convinced that A.D. was telling the truth. Jamie Pastorius, CSB caseworker, testified that she also believed A.D.'s allegations of sexual abuse. Also, Donald Kissinger, who conducted Appellant's sexual offender assessment, testified that he did not believe Appellant's denial of sexual abuse. Indeed, no counselor, therapist, psychologist, or any of four caseworkers testified that he or she did not believe A.D.'s allegations. Finally, in addition to hearing the testimony of all of these witnesses, the trial judge interviewed A.D. in camera. She concluded that she believed the allegations of A.D.
 {¶ 40} Therapist Wendy Hogan also worked with A.D.Jr. The child presented with concerns of neglect, physical abuse, anger, aggression, behavioral and academic problems, and conflicts with his sister, A.D. He is on medication for symptoms of depression and mood fluctuation. He has been diagnosed with attention deficit hyperactivity disorder, posttraumatic stress disorder, anxiety disorder, adjustment disorder, physical abuse, and neglect. He is in counseling and psychiatric services.
 {¶ 41} A.D.Jr. reported long-term and frequent abuse by Appellant with belts and boards. A.D.Jr. consistently refused to see his father and was angry with him because of the history of physical abuse. Appellant admitted that he hit A.D.Jr. and that the child might, in fact, be afraid of him because of that. Janice Archie also testified that she saw Appellant hit A.D.Jr. with his hand and belt, and that A.D. "might get cracked on the butt." The trial judge also interviewed A.D.Jr. in camera.
 {¶ 42} The family was serviced by a series of four CSB caseworkers: Karen Annis, Jamie Pastorius, Julie Dustman, and Alexis Jemison-Knott. CSB was initially involved with the family in August 2001 in regard to another child of the parents. That case continued until January 2003 and was then closed. A second case was opened with the family in February 2003 and concluded without services on March 5, 2003. A third case was opened on May 1, 2003 and was concluded in March 2004. The present and fourth case was also opened in May 2003.
 {¶ 43} Caseworker Annis explained that whenever CSB is presented with a concern that there has been sexual abuse of a minor, the agency performs a risk assessment to evaluate the concerns and make recommendations for further services. In this case, Annis testified that CSB concluded that there was a moderate to high risk to the children in the home, that there were concerns regarding the parents' ability to meet the children's needs, and that a case plan should be opened. Annis then conveyed the agency's concerns to the parents. Appellant denied the allegations and contended that A.D. was lying. Mother admitted that the allegations were possible.
 {¶ 44} A case plan was developed which required both parents to obtain and maintain appropriate housing; maintain adequate financial resources to provide for the children's basic needs; obtain mental health assessments and follow all recommendations; attend parenting classes; participate in marital counseling and follow all recommendations; establish paternity for R.D.; participate in a substance abuse evaluation and follow all treatment recommendations. In addition, Appellant was to successfully complete a sexual offender evaluation and comply with all recommendations. The children were to receive counseling and/or developmental assessments.
 {¶ 45} The children obtained counseling and developmental assessments as needed. Such efforts resulted in improvement in A.D.'s interaction with peers and adults, in A.D.Jr. doing well in his foster home, in K.D. making significant academic improvements, and in R.D. having tubes placed in her ears so that she could make progress on her speech and hearing delays.
 {¶ 46} Consideration of Mother as a possible custodian for the children was initially burdened by her uncertainty as to whether she would stay with Appellant, and, later, by her abandonment of the children. By the time of the permanent custody hearing, Mother had failed to complete any aspect of her case plan: housing, employment, parenting classes, visitation, mental health counseling, marital counseling, or substance abuse treatment, and she had not visited with the children for seven months.
 {¶ 47} For his part, Appellant accomplished several components of his case plan. He was deemed to have maintained satisfactory housing, had transformed a history of frequent unemployment into nearly two years at the same full-time job, and successfully participated in a substance abuse evaluation and random drug tests. The most critical issues in Appellant's case plan, however, remained unsatisfied. Those issues included treatment for sexual offending and mental health problems, and some question as to parenting skills.
 {¶ 48} Donald Kissinger, a licensed clinician and therapist with Northeast Ohio Behavioral Health, administered a mental health evaluation and a sex offender risk assessment to Appellant in October 2003. Kissinger explained that, in order to determine whether there is a high probability that the alleged offenses occurred, he evaluates several risk factors. Those factors include: the alleged perpetrator's sexual history, the number of abuse allegations, whether the allegations occurred over an extended period of time, whether the offenses involved touching with clothing being removed, the alleged perpetrator's age in relation to the victims, his work history, marital or relationship history, boundary issues in the family, and disruptive and aggressive behavior.
 {¶ 49} Kissinger reported that Appellant had been married four times, and that three of his wives were 18 at the time of the marriage. Appellant had four children with his first three wives, but has had infrequent contact with any of those children. Appellant's marriages had many problems and poor boundaries. His current wife gave birth to a child that was not his biological child. His third wife went out on their wedding night. Appellant followed her and found her prostituting herself.
 {¶ 50} Appellant has a long history of alleged sexual offenses, many of which involved touching with clothing being removed. One daughter from a previous marriage alleged that Appellant raped her. A niece alleged that he propositioned her to engage in sexual relations for money or drugs. In the present case, A.D. has made a number of allegations of sexual contact.
 {¶ 51} Kissinger noted problems with disruptive and aggressive behavior. Kissinger observed that Appellant admitted to physical abuse, arguing, domestic violence, viewing pornography, and striking a police officer. There are ongoing allegations of physical abuse, neglect, and related problems for which Appellant tended to blame agencies, relatives, and neighbors.
 {¶ 52} Kissinger also testified that Appellant had a history of frequent unemployment. Appellant explained that the frequent moves of his current family resulted from his efforts to find employment.
 {¶ 53} While Appellant denied sexually abusing A.D., Kissinger did not believe him. Based on Kissinger's consideration of the risk factors, he concluded that there was a high probability that Appellant committed sexual offenses against A.D. Accordingly, Kissinger recommended that he have no unsupervised contact with anyone under 18 and that he undergo intensive outpatient counseling to address sexual offending problems. Without counseling, Kissinger believed Appellant was at a high risk to re-offend.
 {¶ 54} Caseworker Pastorius helped to arrange for the recommended counseling sessions for Appellant. Appellant completed the intake procedure for a sex offender treatment group with Archangela Wood, Ph.D., a clinician in the forensic department of Summit Psychological Associates. The agency was able to provide sexual offender treatment, mental health counseling, substance abuse treatment and anger management at a sliding-fee cost of $50 per week. At first, Appellant refused to participate in the sexual offender portion of the treatment program and maintained that the cost was a barrier. The caseworker and guardian ad litem met with Appellant to emphasize the importance of attending the program and to discuss budgeting. Appellant agreed that it was possible for him to afford the program, and began attending, but was soon terminated for failure to attend.
 {¶ 55} Wood expressed concern with Appellant's ability to understand his behavior and failure to complete treatment. Based on Appellant's very defensive behavior and unwillingness to discuss any aspect of what brought him to the institution, she concluded that he still needs specific treatment for sex offender problems. Wood emphasized that an individual could come to the agency, deny that he needs sex offender therapy, and still receive mental health services.
 {¶ 56} Appellant sought to get a second opinion regarding his evaluations from Bob Bell of Catholic Social Services. Bell did not do a complete sex offender risk assessment and could not make a recommendation in that regard. Appellant admitted that Bell was not licensed to do sexual offender counseling, but Bell offered to do mental health counseling with Appellant. Appellant saw Bell twice and Appellant suggested that he had completed his mental health counseling. According to caseworker Pastorius, however, Bell did not continue services because Appellant was not receptive to on-going counseling.
 {¶ 57} The CSB caseworkers each stated that they continued to discuss the expectations of the case plan, the services offered, and the importance of complying with the case plan with Appellant. They expressed concern that Appellant did not seem to understand the need to comply with the recommended treatment, was not willing to address sexual offending, and continued to pose a risk to the children.
 {¶ 58} CSB was also concerned with negative family dynamics and poor parenting by Appellant. CSB did not dispute that Appellant eventually attended the required 12 parenting classes. But Terri Jackson, education specialist at Akron Pregnancy Services, testified that Appellant was not successful in the program because he did not obtain the understanding and knowledge expected of parents. Jackson testified that Appellant was argumentative and disruptive. She also stated that she was forced to stop the class several times because of persistent arguing between Appellant and his wife, and eventually had to ask Appellant to leave.
 {¶ 59} Upon review, the weight of the evidence on this best interest factor weighs in favor of termination of parental rights.
2. Wishes of the children
 {¶ 60} The trial judge conducted in camera interviews with A.D., A.D.Jr., and K.D.K.D. did not have the sufficient maturity to voice an opinion as to custody. Both A.D. and A.D.Jr. have consistently expressed anger at Appellant for his abuse, and are adamant that they never want to see him again. While A.D. and A.D.Jr. initially hoped to be reunited with their mother, they have now come to terms with her separation. Both wish to be adopted. A.D. would like to stay with her current foster family. A.D.Jr. also expressed a wish to remain with his foster family, the foster family of his younger siblings, or with his Aunt Lois — someplace "safe." In addition, while A.D. and A.D.Jr do not get along well with each other, they very much enjoy visits with their three younger siblings and would like to maintain those relationships.
 {¶ 61} Gina D'Aurelio, the guardian ad litem, believed that it was in the best interests of all the children to be placed in the permanent custody of CSB.
3. The custodial history of the children
 {¶ 62} The third best interest factor requires consideration of the custodial history of the children. In the present case, all five children were removed from the home in May 2003. By the time of the permanent custody hearing, all of the children had been in care for nearly two years. Appellant visited with the three youngest children regularly at the visitation center, but Mother had not visited since July 2004. The two older children have consistently refused to see Appellant during the nearly two years of this proceeding.
 {¶ 63} A.D. was initially placed in Safe Landing, an overflow placement resource for older children, and was then placed in a series of three foster homes. She was placed with her brother, A.D., in her first foster home, and was moved because they could not get along together. She disrupted from the second foster home because she could not get along with another child in that placement. She returned briefly to Safe Landing, and was then placed in her current foster home. There, she has demonstrated growth and has done very well. Her current foster family is interested in adopting her.
 {¶ 64} A.D.Jr. has been in the same foster home for the entire duration of this proceeding. He enjoys visits with his three younger siblings, K.D., R.D., and J.D. While A.D.Jr. continues to do poorly in school, he is trying to do better, and has gotten along well with his foster family.
 {¶ 65} The three youngest children were initially placed together in a traditional foster home, but K.D. and R.D. were moved to a therapeutic foster home because they were found to have special needs. J.D. was placed with Janice Archie for about three months. A referral stemming from a cigarette burn and infected bug bites led to his removal and placement with K.D. and R.D. in their therapeutic foster home where he remained until the permanent custody hearing. He does continue to have visits with Janice Archie.
 {¶ 66} K.D. has been in counseling for anger and coping skills while she has been in care. She received an individualized education plan and has caught up in her school work. When three-year-old R.D. came into care, she was not toilet trained and had speech and hearing delays. Following a developmental assessment, she had tubes placed in her ears, entered Head Start, and started making good progress.
 {¶ 67} The record indicates that the children had serious unmet needs while they were in the care of their parents, and those needs have been much better met while they have been in foster care.
4. Legally secure permanent placement
 {¶ 68} Caseworker Jemison-Knott testified that the children need a legally secure placement and she believed it was in the best interest of the children to be placed in the permanent custody of CSB. She explained that Mother has not addressed any of her case plan issues and has abandoned her children. She also explained that there remains a major concern as to Appellant's sex offending and mental health issues. She does not believe Appellant can provide the structured environment the children need. Without appropriate counseling, all of the caseworkers believed that Appellant would place the children at risk of sexual and physical abuse. According to Jemison-Knott, neither of the parents has made a commitment to remedy any of the issues that brought this case into existence and several of those issues continue to exist. Because the parents have not made a commitment to resolving their own issues, CSB does not believe the parents can meet the needs of the children.
 {¶ 69} The guardian ad litem pointed out that Mother used drugs, alcohol, and has prostituted herself. She was gone for long periods of time and failed to protect or provide for the children. None of the children has a bond with her any longer. As to Appellant, the guardian ad litem stated that she believes Appellant loves his children, especially the three youngest children. Nevertheless, Appellant has not remedied the problems that caused the children to be removed from the home. The guardian ad litem believes the allegations made by A.D. and credits Kissinger's conclusion that Appellant is at high risk to re-offend. The guardian ad litem also expressed concern with Appellant's failure to address mental health problems and anger management. She emphasized that even if Appellant denied that he needed sexual offender treatment, he should have pursued mental health counseling and he did not.
 {¶ 70} In addition, she noted the very dysfunctional marriage of these parents, the constant fighting, and poor parenting. There was too much physical discipline and inappropriate language, including sexual discussions. The guardian ad litem noted that Appellant even swore and screamed at her in anger. The guardian ad litem believed that Appellant has been unable to meet the needs of his children in the past, and did not believe that he could do so now.
 {¶ 71} All the children are doing well in their foster placements, have made significant improvements, and are bonded with their respective foster families. The guardian ad litem, Gina D'Aurelio, believes that it would be extremely detrimental to A.D. to be returned home. Her foster parents have expressed an interest in adopting her. She also indicated she does not believe that A.D.Jr. would get appropriate care by either parent. His foster parents are not interested in adoption, but have indicated that they would consider a long-term placement. The therapeutic foster family with whom K.D., R.D., and J.D. are all placed is not interested in adoption.
 {¶ 72} CSB investigated several relatives for possible placement, but none was found to be willing and suitable. Maternal grandmother and maternal brother were ruled out because of mental health problems. A.D.Jr. and K.D. requested placement with Lois Archie, a paternal aunt, but she was not able to assume custody. Janice Archie, another paternal aunt, had moved for legal custody, but there were significant concerns with placing any of the children with her. Both A.D. and A.D.Jr. stated that they did not believe the younger children should be placed with Janice Archie. The guardian ad litem and CSB expressed concern that Janice Archie would allow Appellant to have contact with the children if she had custody. Janice Archie had previously had her own children placed in CSB custody based on claims of neglect several years earlier.
 {¶ 73} The guardian ad litem concluded by stating that the children need a legally secure placement and that cannot be accomplished without granting permanent custody. There were no suitable friends or relatives willing to provide for their care.
 {¶ 74} Upon review, the record demonstrates that there was evidence before the trial court from which it could conclude that permanent custody was in the children's best interests. The record does not support a conclusion that the trial court clearly lost its way and created a manifest miscarriage of justice. Consequently, the trial court did not err in denying the motions for legal custody, terminating the parental rights of Appellant, Mother, Antonio Lopez, and John Doe, unknown father of the five children, and placing the five minor children in the permanent custody of CSB. Appellant's third assignment of error is overruled.
 III. {¶ 75} Appellant's three assignments of error are overruled. The judgment of the Summit County Court of Common Pleas, Juvenile Division, is affirmed.
Judgment affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App. R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App. R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App. R. 30.
Costs taxed to Appellant.
Exceptions.
Carr, P.J., Batchelder, J. Concur
[1] The factor set forth in R.C. 2151.414(D)(5) is not relevant in this case.